

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | Criminal No. 1:14-cr-18 |
| v. ) | |
| ) | **UNDER SEAL** |
| ROBERT TIMOTHY KOGER, ) | |
| Defendant. ) | |

## STATEMENT OF FACTS

The United States and the defendant, ROBERT TIMOTHY KOGER ("KOGER"), stipulate that the allegations in the Criminal Information and the following facts are true and correct. The United States and KOGER further stipulate that had the matter gone to trial, the United States would have proven the allegations in the Criminal Information and the following facts beyond a reasonable doubt.

### Conspiracy to Commit Wire Fraud

1. From the mid-to-late 2000s through in or about 2012, in the Eastern District of Virginia and elsewhere, the defendant, KOGER, did knowingly and intentionally combine, conspire, confederate, and agree with JONATHAN PROPP ("PROPP"), R.H., TODD LAWYER ("LAWYER"), and others known and unknown to commit an offense against the United States, namely wire fraud, in violation of Title 18, United States Code, § 1343, that is: having devised a scheme to defraud and to obtain money and property by means of materially false and fraudulent pretenses, representations and promises, caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals for the purpose of executing the scheme and artifice, all in violation of Title 18, United States Code, § 1349.

2. KOGER was the President and sole owner of Molinaro-Koger, an international hotel real estate brokerage and advisory firm headquartered in Tysons Corner, Virginia.

3. It was part of the conspiracy that KOGER successfully executed a series of illegal "flips" of hotels. As a broker, Koger, was, *inter alia*, generally precluded from "intentionally or negligently failing to disclose to any person with whom the applicant or licensee deals a material fact that the licensee knows or should know and that relates to the property with which the licensee or applicant deals." In executing the flips, KOGER convinced his client to sell the property to another entity, which KOGER essentially created and controlled (*i.e.*, a straw buyer), without the knowledge of the seller, for a price substantially less than a true buyer was willing to pay. KOGER then arranged the timing of the two sales to be consecutive, that is, with one settlement being immediately after the other. In the first settlement, KOGER's client sold the property to the straw buyer (*i.e.*, the front-end transaction); in the second, the straw buyer sold the property to the actual/real purchaser (*i.e.*, the back-end transaction). The closings for both transactions often occurred on the same day and were typically handled by the same law firm and title company. KOGER then directed the distribution of the proceeds "earned" by the straw buyer, using these criminally derived funds for his own benefit. With regard to the straw buyers, KOGER sometimes used his friends or employees, or assumed identities of other persons without the knowledge of those persons, to pose as the owners of the straw buyers. During the course of the conspiracy, including with respect to the transactions described below, KOGER communicated with clients, prospective buyers, and his co-conspirators by electronic mail and telephone conversations, which caused to be transmitted by means of wire communication in interstate commerce writings, signs, and signals for the purpose of executing the scheme and artifice.

4. The following are examples of illegal "flip" transactions that took place during the conspiracy. For both of these illegal "flip" transactions, Host Hotels and Resorts L.P. ("Host") was a victim:

    a) **Dulles/Stamford Flip:** In June 2009, KOGER arranged the sale of the Washington Dulles Suites Marriott in Herndon, VA, and the Sheraton Stamford in Stamford, CT, from his client, Host, one of the nation's largest hotel owners, to a straw buyer, Scioto Partners, LLC ("Scioto"), (*i.e.*, the front-end transaction). KOGER's personal friend and business associate, LAWYER, and KOGER's employee, T.J.L., served as the straw buyer's principals on the transaction documents. On the same day the front-end transaction closed, KOGER brokered Scioto's resale of both properties (*i.e.*, the back-end transactions). Despite owning the properties for less than a day, KOGER/Scioto earned substantial profits through the flips. In addition, on the front-end transaction KOGER, as broker, earned a commission from Host; KOGER also earned a commission from Scioto on the back-end transaction as well.

    b) **Dearborn Ritz Flip:** In June 2010, KOGER arranged Host's sale of the Ritz-Carlton in Dearborn, MI, to a straw buyer, Dearborn Hotel LLC, (*i.e.*, the front-end transaction), an entity whose $1 million deposit was made by Gestin LLC, an entity owned by KOGER. On the same day that the front-end transaction closed, KOGER arranged the Dearborn Hotel LLC's resale of the property (*i.e.*, the back-end transaction) to 2010 Dearborn Investment LLC, the ultimate purchaser. Notwithstanding the fact that he died in February 2010, KOGER's employee, T.J.L., was purportedly the beneficial owner of Dearborn Hotel LLC, and T.J.L.'s

3

purported signature appeared on the June 2010 purchase and sale documents. Despite owning the property for less than a day, Dearborn Hotel LLC earned profits from this flip, all of which was paid to KOGER or his designee.

5. In April 2010, moreover, Host entered into an agreement to purchase certain promissory notes (the "B2B3 Notes") that were secured by hotels Host had an interest in acquiring. During negotiations regarding the purchase of notes, KOGER, as Host's paid advisor, made a series of false representations to Host regarding the ownership history of the notes and how they were going to be acquired. PROPP, serving as the nominal owner of an entity known as B2B3 Puppet LLC, falsely claimed to own the notes and entered into an agreement to sell them to Host. Because Propp was serving as the straw buyer, KOGER told R.H. to take Propp's name of off Molinaro-Koger's website. As R.H. knew, KOGER wanted this done in order to reduce the likelihood that someone at Host would discover the fact that Propp was associated with KOGER. Either R.H. or one of his subordinates removed Propp's name from Molinaro-Koger's website in furtherance of the conspiracy. After Host agreed to buy the notes from B2B3 Puppet (who did not yet own them), and aware of the price that Host was obligated to pay for the notes, KOGER/B2B3 Puppet used a series of nominees to acquire the notes from their actual owner and, immediately thereafter, re-sold them to Host at an inflated price. KOGER generated millions of dollars in profits on this purchase/resell.

6. It also was part of the conspiracy that, beginning in 2009 and continuing through in or about 2012, KOGER executed a Ponzi scheme to steal and launder funds held "in escrow." To execute this scheme, KOGER/MK received deposits from prospective buyers of hotels which were to be held in escrow while he negotiated with the hotel's owners regarding the terms of the sale. Contrary to his representations to the prospective buyers, KOGER/MK was not actually

holding their funds in escrow. Instead, KOGER/MK used their funds to pay for personal and business expenses, including to repay those whose funds were previously purportedly escrowed. As such, KOGER was executing a scheme to steal and use these escrowed funds.

7. Beginning in at least the fall of 2012, KOGER was aware that the Federal Bureau of Investigation (FBI) and the United States Attorney's Office for the Eastern District of Virginia were conducting a grand jury investigation into his role in the above-discussed "hotel flipping" and escrow scheme. On Thursday, May 30, 2013 and Tuesday June 4, 2013, one of undersigned counsel for the United States received emails purportedly from "Sonny Jones," ("Jones") who identified himself as a former Host employee. "Jones" claimed that he had information that would be helpful to KOGER, and he parroted claims that KOGER previously made regarding Host concealing information from the government that would exonerate KOGER. "Jones'" emails therefore raised a number of issues that, if true, would have been material to the government's ongoing investigation of KOGER, which caused (or could have caused) the government to expend resources investigating. In reality, KOGER sent those emails under an assumed name, and assertions contained therein were not true.

### Wire Fraud of K.P.

8. From in or around May, 2013, through in or around September, 2013, in Tysons Corner, Virginia, in the Eastern District of Virginia and elsewhere, the defendant, ROBERT TIMOTHY KOGER, knowingly and unlawfully devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations, and promises. On or about each of the dates set forth below, in the Easter District of Virginia and elsewhere, KOGER, for the purpose of executing the scheme described below, caused to be transmitted by means of wire communication in interstate

commerce the signals and sounds described below, all in violation of Title 18, United States Code, Section 1343.

9. K.P. was a Tampa, Florida-based physician and businessman who owned the Wyndham Grand Hotel in Pittsburgh, Pennsylvania ("K.P.'s hotel"). BlackRock Financial Management Inc. ("BlackRock") was an investment management firm, which held a $43 million promissory note ("note") secured by an interest in the Wyndham Grand Hotel. In or about July 2013, BlackRock decided to sell the note, and K.P. placed an offer to buy it for $37 million with HFF, a broker that BlackRock had engaged to sell the note.

10. KOGER's scheme and artifice caused K.P. to pay $2.5 million from K.P. with what is described below as the "Walk Away Fraud." After receiving this payment, KOGER further attempted to obtain millions of more dollars from K.P. in connection with what is described below as the "Break Up Fraud."

11. It was a part of the scheme and artifice to defraud that defendant KOGER used over nine aliases, including but not limited to: "Rick Thompson," "Richard Thompson," and "John Stern," and various entities, among which were GICRE Holdings, PAAG Holdings, LLC, PAAG Investments, LLC, Hotel Assets International Inc., Mellon Family Real Estate Trust ("MFRE Trust"), and RI Portfolio, LLC. KOGER assumed these false identities so that K.P. would not be aware of his involvement in the note and hotel related purchase transactions as ROBERT KOGER.

### *"Walk-Away Fraud"*

12. In or about the summer of 2013, KOGER, using the name "Rick Thompson" or "Richard Thompson," engaged a Tampa attorney, [T.S.], to inform K.P. that "Thompson," whom T.S. stated worked for GICRE Holdings, wanted to buy K.P.'s hotel and was willing to pay $85

million for it. KOGER, acting as "Thompson," further caused to be represented to K.P. that PAAG Holdings, LLC, an entity related to GICRE Holdings, had placed a $40 million confidential bid on BlackRock's note and planned to acquire the Wyndham Grand Hotel by first acquiring the note and then, after alleging violation of loan covenants, foreclosing on the note. KOGER then represented to K.P. that in exchange for $2.5 million, "Thompson" would withdraw his bid on BlackRock's note and purchase the hotel from K.P. for $87.5 million (*i.e.*, "Thompson's" initial offer of $85 million plus the $2.5 million walk-away fee that K.P. was to pay to "Thompson").

13. In reliance on these written and verbal representations made by "Thompson" and T.S., KOGER induced K.P. to wire transfer $2.5 million to T.S.'s client trust account at TD Bank on or about July 3, 2013. KOGER thereafter caused the money to be wire transferred to The Turks and Caicos Islands, where it was laundered through an attorney's account and, ultimately, returned to the United States. KOGER kept or spent nearly all of this money for his own benefit.

*"Break-Up Fraud"*

14. On or about July 3, 2013, KOGER, as "Thompson," signed a binding term sheet with K.P. on behalf of PAAG Holdings LLC. In the document, which was post-dated to July 30, 2013, "Thompson" agreed to purchase K.P.'s hotel for $87.5 million and promised to make a non-refundable deposit of $5 million. The document also contained an exclusivity requirement prohibiting K.P. from negotiating with, or entertaining offers from, any other buyers.

15. On or about July 23, 2013, KOGER, claiming to be "John Stern," telephoned K.P. and told him that the MFRE Trust, which he said he represented, was willing to pay $125 million to acquire K.P.'s hotel. Significantly, KOGER established an email account of jstern@mfretrust.com on or about July 23, 2013 (*i.e.*, the same day "Stern" first contacted K.P.).

16. After speaking with K.P. on the phone and using the name, "John Stern," on or about July 23, 2013, KOGER sent a FedEx package from Vienna, Virginia, to K.P. in Tampa, Florida, with a letter of intent to purchase K.P.'s hotel for $125 million. KOGER, claiming to be "John Stern," also personally met with K.P. on or about August 1, 2013, in K.P.'s Tampa office to discuss the sale and purchase of K.P.'s hotel. On or about August 29, 2013, KOGER, claiming to be "John Stern," flew from Dulles International Airport, Virginia, to Tampa, Florida, to meet K.P., and, posing as the "MFRE Trust's Managing Director," signed a $125 million purchase offer for K.P.'s hotel.

17. After "Stern" offered $125 million to K.P. for his hotel, KOGER, now claiming to be "Rick Thompson," re-contacted K.P., accused him of breaching the exclusivity clause of their July 3, 2013, agreement, and demanded that K.P. pay him a "break-up" fee of $15 million for breaching that agreement by negotiating with "Stern." In addition, on or about August 25, 2013, KOGER, claiming to be "Rick Thompson," spoke with K.P. on the telephone and threatened to sue him if he did not pay to "Thompson" the $15 million "break-up" fee. "Thompson" then agreed to a compromise figure of $11 million provided that K.P. pay it quickly.

18. In furtherance of the "Break-Up Fraud" and the "Walk Away Fraud, KOGER knowingly and unlawfully caused numerous writings, signs, and signals to be transmitted by means of wire communication in interstate commerce, including but not limited to telephone calls from KOGER (located in the Eastern District of Virginia) to K.P. (located in Florida) on July 2, 2013, July 22, 2013, July 31, 2013, and August 28, 2013.

## Conclusion

19. KOGER's actions in furtherance of the offenses charged in this case, including the acts described above, were done willfully, knowingly, and with the specific intent to violate the law.

20. The foregoing statement of facts is a summary of the principal facts that constitute the legal elements of the offenses of conspiracy to commit wire fraud and wire fraud. This summary does not describe all of the evidence that the government would present at trial or all of the relevant conduct that would be used to determine the defendant's sentence under the Sentencing Guidelines and Policy Statements. KOGER acknowledges that the foregoing statement of facts does not describe all of KOGER's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom KOGER may have engaged in illegal activities.

Respectfully submitted,

Dana J. Boente,
Acting United States Attorney

By: _____
Michael E. Rich
Chad I. Golder
Assistant United States Attorneys

Date: 2/16, 2014

After consulting with my attorney and pursuant to the plea agreement entered into this day between the defendant, ROBERT KOGER, and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 1/16/14

_____
ROBERT T. KOGER, Defendant

I am ROBERT KOGER's attorney. I have carefully reviewed the above Statement of Facts with him. To my knowledge, his decision to stipulate to these facts is an informed and voluntary one.

Date: JAN. 16, 2014

_____
Peter D. Greenspun, Esq.
Attorney for ROBERT T. KOGER

10